This is Harrow v. Atty Gen USA, 22-1854. Who's arguing for the petitioner? Are you Christopher? Ms. Costello. I have a different name here, it's fine though. How are you, Ms. Costello? Good morning, Your Honors, and may it please the Court. My name is Kaitlin Costello from the law firm of Palladino, Isabella, and Casasa, and I'm here to represent the petitioner in this case. I would like to reserve three minutes for rebuttal. Absolutely. Thank you. This is a case that involves a petitioner who is likely to face torture in Somalia, and in which the immigration judge and the Board of Immigration Appeals made numerous legal errors in failing to establish legal precedent. The BIA first erred in this case in failing to conduct a de novo review of the second inquiry of the first prong of the Myrie analysis in determining whether the harm that petitioner would face would amount to torture under the law. In this case, the BIA said that the standard review that they applied was that the overall likelihood of harm in the case was not clearly erroneous and failed to conduct a de novo review of whether the harm that petitioner would face would amount to torture. This is with respect to which specific PSG? This is under the Convention Against Torture. Okay. So there's no PSG required for the Convention Against Torture. It's under the likelihood of torture under the first prong of Myrie. All right. And then the second is whether the government would torture or acquiesce to torture. In the first prong of under Myrie, the first inquiry is a factual inquiry of what the petitioner would face if removed, and then the second is whether that amounts to torture. The BIA also erred in finding that the petitioner wouldn't be subjected to torture by requiring individualized evidence of torture. Here the BIA and the IJ required that the petitioner show that he would be singled out for torture, despite a generalized risk of torture in the country as a member of a protected group. Did the record establish a generalized risk of torture or violence, and is there a difference? Your Honor, the IJ found that the petitioner was likely to, that there was evidence in the record that retornees to Somalia do face a risk of torture, but that the petitioner himself couldn't find, didn't show that he would be singled out for torture. The Third Circuit has said that the country conditions alone can be sufficient to demonstrate a likelihood of torture in the country. So the United States, as I understand, is not the only nation to have joined the Convention Against Torture. A lot of nations joined the Convention Against Torture. Do you know if there's any other nations that find that they are not going to repatriate Somalis to Somalia because of the generalized conditions of torture in Somalia? Your Honor, I'm not aware of a blanket policy for any country.  So the record has no evidence of any other country finding that a Somali expatriate from their country would be tortured upon return to Somalia. So that suggests that maybe it would be just the United States that would say, we find there to be torture, but if you were in another western country like Canada or the UK, they don't find there to be those generalized concerns. We've ratified the same treaty. They aren't worried about those concerns, but you're asking this court to be? Your Honor, there is evidence in the record of other countries finding that there is a risk of torture to western returnees. I can't say if there's a blanket policy under their immigration law, whether that they protect all Somali deportees or returnees, for example. However, there is evidence of other countries finding that returnees would be subjected to torture upon return. Are there any statistics kept of returnees under the convention? Yes, Your Honor. Well, there's been a number of studies by different think tanks and journalists of deportees, especially within the last 10 years. For example, in 2018, there was a finding that 66.7 of Somali Bantu deportees, which includes the petitioner sub-clan who were moved to Somalia, were tortured. There are similar statistics. I would like to know the statistics from what other countries are doing. There is some evidence in the record from the Canadian Refugee Agency. I would have to look at those specific statistics about what they found the likelihood was, but there is evidence of torture from other countries as well. And so before, I mean, at one level, the hardest point, I think, is to just say that there's this generalized notion that Somalia is a dangerous place and that Somalia tortures people. The more that you can tether that to your individual client, the stronger case you have. And one of the things that I can't sort out from the record, and maybe people are saying different things or maybe I just can't figure it out, is it looks like there's at least three tribes or clans or sub-clans, and I can't figure out the org chart of these from the record. There's Galgal, or Galgalay, I don't know what that is. That's what he said he was a member of in 2000. Apparently, that was a lie. And then there's Bandaval, which I don't know if that's a clan or a tribe. And then there's Rear Hamar, which I don't know if that's a clan or a tribe. So as I'm reading this record, I can't fit. And your blue brief says something different than I inferred, at least, from the IJ's record. And so I'd just like to know your position on how those three fit together in these respects, at least. Are some clans or sub-clans of another, and are some considered minority tribes versus non-minority tribes? Can you kind of give me a taxonomy of that? Yes, Your Honor. So basically, the record shows that there's four- In answering that question, the Georgia study talks about ethnic Somalis versus ethnic Bantu. And the Bantu were tribes who were brought into Somalia as slaves by the Somalis. So when you're talking about these various tribes, are these Bantu tribes or Somali tribes? Yes, Your Honor. So in general, it's a complicated system, but there are basically four major dominant sub-clans in Somalia. And then there are a number of minority sub-clans, and then sub-clans within those. Petitioner is a member of the Rear Hamar, which is a part of the larger Bandabau clan, which is a minority clan. So the government basically separates the four major- Is that a Bantu clan? Yes. Petitioner is of the Bantu clan, the Bantu group, which is a formerly enslaved group. I'm sorry, Your Honor? Yes. 85% of Somalis are ethnic Somalis, and 15% are Bantus, and then there's 60,000 Arabs or something like that. So when you're talking about Mr. Petro's clan, it would be helpful to me if you could determine whether- Because one of the rejected, I believe, descriptions of the class he belonged to was returning minority citizens. And does that mean returning Bantu citizens, or is that what you're considering as a minority? Well, we would- I'm sorry, Your Honor. Go ahead. Thank you, Your Honor. We would consider minority as any of the 0.5% minority subclans that the government has allocated as a minority group that can participate in the government, of which the petitioner is a part. So that includes a lot of minority groups. So what work does minority do? It strikes me that there have been a lot of different designations of the particular social group. There was a lot that were thrown around in front of the IJ that got smaller in front of the BIA. And now it's singular, as far as I can tell. And the singular one is repatriated minority Somalis. That's the only PSG that's in play here. I guess my question is, what work does the modifier minority do here? Because it strikes me that all of the harm that you think that your client is going to face comes from the fact that he's repatriated, that he's westernized, and that they don't like westernized people. That has nothing to do, as far as I can tell, with the fact that he's in a minority clan, other than the fact that minority clan might be disliked for other reasons. But it seems that the work that's being done here is repatriated. And I guess I'm just kind of curious in terms of what about him being repatriated as a minority clan member is different than him being repatriated as a majority clan member. Yes, Your Honor. As a repatriated minority clan member, it's especially significant because everything in Somalia, and particularly in Mogadishu, is based on clan. So even the government security forces are loyal to certain clans. So while somebody maybe who would be repatriated as a returnee would still face some risk, petitioner's risk is extremely heightened as a minority sub-clan member because he doesn't have that same protection through his clan that a dominant clan would have as a returnee. They would still face some risk, I would argue. But the risk that he would face is particularly heightened because of the – So if I'm hearing – so just to confirm that I'm hearing right, in essence what you're saying is all repatriated Somalis, at least from Western nations, face some risk. Clans can mitigate that risk by protecting their own. And as a minority clan, his clan has less power to protect him. Yes, Your Honor. Well, let me just push back on that a little because the record seems to indicate that his clan's minority status isn't quite as disenfranchised as he may make it sound. They do hold positions in government. They have been – and it seems that really they do have some power. And now we're asked, you know, thousands and thousands of miles away to talk about how much power to protect one minority clan has versus another minority clan versus a majority clan. That's a hard task, right? It is a hard task, Your Honor. But that's why we rely on the country's conditions research to explain what the situation is there. I'm sorry, I see my time is up. Can I finish? Please finish. So as, you know, as the country conditions show, the clans, you know, are very – based on the, you know, the relationships between each other. And so some people, individuals, you know, have retained some positions of power. And particularly one finding that they relied on is that some people have attained some power through intermarriage, particularly women. You know, that's not the case of the petitioner in this case. And particularly as he's been gone for, you know, now over 20 years, you know, living in the United States, he doesn't – wouldn't have those same ties that some people have been able to attain through, you know,  Thank you, Your Honor. Thank you. Good morning, Ms. Jones. Good morning. May it please the Court, Tracy Jones, appearing on behalf of the respondent, the U.S. Attorney General. I see the Court has expressed some concerns in regards to the cat protection finding, so I'm going to start my argument off there. Just to clarify a few things. With respect to cat protection, there is no protected ground, so there's no nexus. So the PSG finding that applied to withholding and removal does not apply to cat. Now, in the petitioner's opening brief and also in their reply brief, the petitioner argues that the Court did not – of the second prong of the first step of the test in finding clear probability of torture. And that's not the case in this case. The Court, in fact, did – I'm sorry. The agency did, in fact, conduct a de novo review of the finding of whether the torture amounted – I'm sorry, whether the harm amounted to torture. In this case, this Court has determined that – oh, I'm sorry. The agency has determined that the petitioner did not show any individualized risk of torture. The petitioner argues that he should not have been required to demonstrate such evidence. In fact, under the regulations, the petitioner has the burden of proof to demonstrate eligibility for cat. And here, the mere showing of generalized violence or harm that's being suffered in Somalia does not show how the petitioner himself would be singled out and tortured if returned. Is that necessary under Third Circuit precedent? Is that necessary under Third Circuit precedent? Yes, Your Honor. In fact, in a case, Hernandez v. Attorney U.S. General, this Court has found that the specter of torture must be supported by specific evidence that the individual applicant is more likely to be singled out and tortured. And in this case, the petitioner has not shown that. The evidence of mere generalized violence does not carry the burden and would not meet the standard required. Regardless, it seems that if this is a fact – Judge Rothman. I'm sorry. If there is cat generalized violence, is that not something that's a risk to the individual as well as to the population as a whole? Yes, but – A response made to the evidence in the file that there are – for instance, in 2018, 66% of returning minority refugees to Somalia were tortured. Is that not enough to indicate any refugee – minority refugee going back to Somalia is facing the risk of torture? No, Your Honor. It's not. That shows that there is torture that is occurring – or torture and harm that's occurring in the country. But it's not showing that for – that the petitioner would be singled out and be harmed based on the – or being harmed or tortured or mistreated. That's not sufficient in this case. The petitioner didn't show any evidence that he himself would be singled out if returned and determined to be a returnee and that he would be tortured on that basis, which is the burden of proof for cat. So the petitioner's failure to show that shows that he failed to meet his burden of proof and therefore not eligible for protection under the Convention Against Torture. And so it's your position that this would be a factual finding that would receive substantial evidence review? With respect to just the individual. So the BIA is looking at the overall – what would – part one, sub one, right? Yes. What would happen. Yes. And what the BIA is saying is, okay, we see that there's a 67 percent chance of some degree of mistreatment. Yes. Okay. Now we have to make a finding, a factual finding, on whether or not – you know, what's going to likely happen. And we don't think that that finding is good enough to implicate Mr. Harrow. Therefore, he didn't meet his burden, and therefore we review that based on substantial evidence review. And so that's the – or not? Or is this somehow de novo, or is this some other standard of review, or is this a legal determination that a burden wasn't met and that now somehow we're into a legal commentary on the amount of facts? Well, with respect to the first part of the first prong of the test, which is what would likely happen to the petitioner if he's returned, that part of the test is reviewed for – is a factual finding, and that's reviewed for clearly erroneous standard. But with respect to part two of the test, is what would likely happen to the petitioner if returned, that's reviewed under de novo standard. If part two was what would happen, would it qualify as torture? Yes, what amounts to torture. That's a legal question. You said clear error. Why is it clear error? I thought it was substantial evidence standard. Is it clear error? I believe it's clear error, Your Honor, if I'm not mistaken, which is what the agency did in this case when they said that the petitioner was – I mean that the immigration judge wasn't clearly erroneous in finding that the petitioner didn't. So the BIA might review it for the IJ's decision for clear error, but don't we review the BIA's decision for substantial evidence? Substantial evidence, yes, that the record does not compel a contrary conclusion. Yes, that's correct. I'm sorry. I misunderstood. Okay. We'll sort that out. So for the petitioner to prevail in a case like this, what would he or she have to demonstrate? That he or she specifically was going to be tortured? Well, no, Your Honor. The petitioner doesn't or the applicant doesn't have to submit evidence that identifies them specifically that this would happen, but they just have to show that there's a 50% chance, a 50% or more chance that they will be tortured. And in this case, just showing mere evidence that there's violence in certain parts of Somalia against returnees or westernized returnees does not necessarily meet that burden. It has to be more, and the petitioner didn't give us – The evidence indicates – you're talking about a 50% chance of being mistreated. The evidence is that in 2018, it was 67%. In the year before, it was 55%. Doesn't that meet your 50% burden of a chance of mistreatment? No, Your Honor, it doesn't. Because another factor that is considered when assessing cat protection is the fact of relocation. There's evidence in the record that's contrary to this one particular piece of evidence that indicates that there are members or returnees to Somalia that are able to have not faced mistreatment or harm in certain parts of Somalia as opposed to the parts that are governed by the terrorist organization al-Shabaab. But did the BIA sufficiently take into consideration the favorable evidence that the applicant presented? Yes, and the board actually cited to that in its decision and indicated that there is evidence that some returnees, once they return to Somalia, are mistreated and harmed. And the immigration judge did the same as well, but they just determined that this evidence of violence that's occurring in Somalia was not sufficient to show that the petitioner himself would be singled out and tortured. Well, they talked about it according to Mogadishu, but it's worse in Mogadishu than it is in other parts of the country, isn't it? I mean, reading the literature, it is in the record that was presented by Paro to the immigration judge and to the BIA that there's no part of the country that's safe. Certainly, going to a big city is probably less safe than staying in the country itself. No, Your Honor. Only in the decision of the BIA said that he has failed his burden. Yes, Your Honor, there's actually evidence in the record in which I cited in my brief in regards to indicating that there are, for example, Mogadishu, where the petitioner could return and would suffer a diminished risk of torture as opposed to going to another part of Somalia. Just to give you an example. There's evidence that he'll suffer a greater risk of torture if he goes to Mogadishu. And you seem to just ignore that whole part of the argument. Well, Your Honor, on page 435 of the administrative record, it states that Mogadishu is experiencing a period of calm because of the government's efforts to try to overthrow the al-Abd al-Shabaab. So there is evidence in the record that supports the conclusion that him returning to Mogadishu would actually have a diminished risk of torture. And evidence of greater risk. You don't deal with that. I'm sorry? There's also evidence of greater risk of returning to Mogadishu, but you don't deal with that. You simply deal with the evidence that supports your position. Well, no, Your Honor. The government acknowledged in their answering brief that there is mistreatment that's occurring in Somalia, but just the mere occurrence of mistreatment and harm and torture in the country is not sufficient to meet the burden of proof. The government acknowledged it in their opening brief, as well as the immigration judge in the agency. So what I'm hearing you saying is you seem to recognize that there's 67%, at least by what I understand the most recent statistics, of mistreatment to repatriated Somalis. Whether all of that mistreatment qualifies as torture, that statistic doesn't tell us that. It's just generalized mistreatment. Some of that's probably torture. Some of it's probably maybe less than torture. At least that's a fair reading of it. And then the BIA looks at that, and the BIA says, well, we have to find out if it's over 50%, likely for him, specifically for him. We're looking at this general figure about 67%. We've accounted for that. And we actually don't think it's enough. That's our factual finding. And we have to review that for substantial evidence review. And so we basically have to say if any rational trier of fact could reach that conclusion, then we deny the petition. But if that's beyond what any rational person could ever think, then we grant the petition. Yes. And what you're saying, as I understand it, is this 67% of evidence, because it's not 67% necessarily of torture, and there may be reasons that aggravate or mitigate the likelihood that an individual person is going to fall into that 67%, the agency's decision based on that figure and really nothing else survives substantial evidence review. Have I misstated your position? Am I encapsulating that? No, that's correct, Your Honor. Okay. So if the Court doesn't have any other questions in regards to Kat, I could conclude, or if you would like, I could go ahead and discuss the PSG with respect to withholding of removal. Let me ask you one question. Yes. You sent us a letter about jurisdiction. Yes. Why did you send it? Well, I just wanted to acknowledge, which was not done in my answering brief, the jurisdictional bar that the Court has on reviewing aggravated felonies or claims for aggravated felons. In this case, even though there is that jurisdictional bar, which would bar the Court from reviewing only the withholding of removal as that the Kat would still be available to be reviewed, we wanted to acknowledge that that bar does exist and would apply in this case. But because the agency's finding was based on the particular social group, this Court has held that the PSG, whether a PSG is cognizable is actually a question of law that the Court does have jurisdictional review. So, therefore, the Court has jurisdictional review, that portion of the petition. But we did just want to acknowledge that there was a jurisdictional bar that was in place. But for something not relevant to our discussion. Well, not relevant to our discussion about Kat, but it would have been relevant to withholding of removal because that was where the jurisdictional bar would have been applied. But because we're discussing a question of law, that jurisdictional bar is an exception to the jurisdictional bar that gives the Court jurisdictional review. Okay. Well, I see my time has concluded. The Court should deny the petition for review because petitioner failed to demonstrate eligibility for withholding of removal in Kat. Thank you. Thank you. Let me ask a question in the beginning. Yes, Your Honor. Estella? Yes, Your Honor. You got the letter on jurisdiction from the Assistant U.S. Attorney? I did, Your Honor. And you understand what it was talking about? More or less. And do you want to add anything to it or respond? No, Your Honor. Okay. Good. It really doesn't come into play here. Is that your position? That's our position. Okay. It might be informative, but it doesn't come into play. Yes, Your Honor. I want to make three main points on rebuttal. First, the government's position is cherry-picking of the evidence. For example, as she stated, that there is evidence in the record that Mogadishu is experiencing a period of calm. In that same article, they cited numerous terrorist attacks before and after that period of calm, including that a suicide bomber had killed the mayor of Mogadishu and several others after infiltrating the government under an assumed identity working there for a year. So although there might be periods of calm or people who can find some safety within there, it doesn't show that there isn't a likelihood of torture. Second is that the agency's conclusion that some returnees do face torture is not an acknowledgment of favorable evidence in the record, but rather is nonsensical because petitioner is a member of that group that is likely to face torture, but yet somehow found that he is not likely to face torture despite the fact that returnees do face torture. And finally, diminished risk is not the standard under which we determine the likelihood of torture. Even if there is a diminished risk of torture within Mogadishu for some people and in some areas who can afford that protection, even if that's the case, let's say that the diminished risk is 60%, 70%, 80%, there can still be a likelihood of torture. So with all the country conditions in the evidence that supports all of the targeting against returnees and particularly of those who have no strong family and clan ties in the country, support our position that the petitioner is likely to face torture and moreover that the immigration judge and the Board of Immigration Appeals failed in numerous ways under the appropriate standards applicable in this case. Thank you very much. Thank you very much, Your Honors. We'll thank all counsel for their arguments and submissions.